IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ZANDRA WILSON ) | |
| o/b/o K.D.W., a minor ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 09-CV-717-PJC |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner, Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION

Zandra Wilson ("Wilson") on behalf of her minor son, K.D.W., requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying K.D.W.'s application for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. K.D.W. appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that K.D.W. was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### K.D.W.'s Background

K.D.W. was 8 years old at the time of the hearing before the ALJ on May 21, 2009. (R. 28). Wilson testified that K.D.W. was repeating first grade and was in special education classes.

(R. 28-29, 38). She testified that K.D.W. had an Individualized Education Program ("IEP") and was in a classroom with three children and two teachers. (R. 39). She said she was "constantly" on the phone with the school. *Id.* Wilson testified that K.D.W.'s math skills were delayed, but that he was making progress in that he could use his fingers as long as the numbers stayed under 10. (R. 38).

Wilson testified that her son was unable to focus, was unable to be still, had no friends, and was very active. (R. 32). She said that at home K.D.W. had trouble completing tasks, and she gave dressing, personal hygiene, and chores as examples, saying that he had to be constantly prompted to finish those tasks. (R. 33). Unless she was there to supervise him, tasks like chores would not get done. *Id.* She said that K.D.W. was imaginative and would try to convince her of things that she didn't see. (R. 34). He would pretend to speak in Spanish. *Id.*

When asked about how often K.D.W. had trouble at school, Wilson gave an example from the previous week when K.D.W. was "walked out" of school four times on one day, which she described as a disciplinary response when the teacher couldn't get K.D.W. to do the task he was supposed to do. (R. 34-35). Wilson testified that one time K.D.W. had told the school that his mother had told him to walk home from school, and when Wilson arrived at the school they had to call the police to search for him. (R. 35). She said that the school knew not to trust what K.D.W. said. *Id.*

Wilson said that home life with K.D.W. was chaotic and there was a lot of fighting. *Id.* She said that K.D.W. had recently hit his 5-year-old brother in the head with a candlestick and sent him to the hospital. *Id.* She described K.D.W. as aggressive and wild. *Id.* She testified that he had taken knives to school before, and he had difficulty distinguishing between real and "fake" things. (R. 36).

Wilson testified that K.D.W. had been on medication for years and that some of the side effects of the medications were inability to eat, dry mouth, and headaches. *Id.* She thought the headaches were a problem about once or twice a week, and that K.D.W. said they were accompanied by flashes of light. *Id.*

The administrative record contains documents from George J. Bovasso, D.O. from 2007 through 2009. (R. 158-61, 182-90, 235-44). These records are hand-written notes on pre-printed forms, and the handwriting is difficult to read. *Id.* It is apparent that Dr. Bovasso diagnosed K.D.W. with attention deficit hyperactivity disorder ("ADHD") and prescribed various medications. *Id.*

The administrative record contains a "To Whom It May Concern" letter dated May 29, 2008 from Ms. Sunday, who identifies herself as K.D.W.'s kindergarten teacher. (R. 156). In her letter, Ms. Sunday listed numerous negative behaviors that she said K.D.W. had exhibited during his year in kindergarten, and she said that the behaviors were extreme at times. *Id.* Two of these behaviors were unwillingness to start or finish his work and inability to sit still. *Id.* She also described many behaviors toward the other children, such as making negative comments, name-calling, acting and speaking disrespectfully, lying, threatening, and bullying. *Id.* She also noted that when K.D.W. took his medication, he would not eat. *Id.*

A second letter, dated April 23, 2009, was written by Kathryn Rockwell, who identified herself as K.D.W.'s first grade teacher. (R. 157). She said positive things about K.D.W., including that he was bright, caring, and hard-working. *Id.* She also said that he had improved, and that he had "amazing potential," but she was concerned that his behavior would not allow him to improve more and to reach his potential. *Id.* She described his telling "stories," and she said that he worried about small things that made him mad all day long. *Id.* She said that

K.D.W. was always talking or making noise and was out of his seat to talk to her. *Id.*

The Administrative Record contains documents from Family & Children's Services, including a Youth Integrated Assessment dated May 30, 2008 stating that Wilson requested services for K.D.W. due to referral by a school counselor. (R. 192-201). The form noted sibling conflict and physical fights with friends. (R. 193). Wilson reported that K.D.W. had been suspended from school twice in the previous twelve months, and in one of those incidents K.D.W. took a knife to school and threatened a classmate. (R. 194-95). K.D.W.'s complaints of headaches were also noted, although part of this hand-written note is obscured. (R. 194). Wilson reported that K.D.W. was physically aggressive toward others, hit himself in the face, and had daily temper tantrums that could last for hours during which he would hit others, hit himself, and cry. (R. 200). It appears that a treatment plan was created based on this initial assessment. (R. 206-14). The treatment plan stated K.D.W.'s Axis I[1] diagnosis was depressive disorder not otherwise specified. (R. 213). K.D.W.'s Global Assessment of Functioning ("GAF") was assessed as 60.[2] (R. 214). The records show that Wilson and K.D.W. only

---

[1] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

[2] The GAF score represents Axis V of a Multiaxial Assessment system. *See* American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> (DSM-IV-TR), 32-36 (4th rev. ed. 2000). A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

attended one session at Family & Children's Services after the initial assessment. (R. 215-16).

A Tulsa Public Schools ("TPS") Psychological Services Comprehensive Report was prepared by School Psychologist Brian G. Pratt after testing on July 16, 2008. (R. 220-21). Mr. Pratt administered the Wechsler Intelligence Scale for Children - Fourth Edition ("WISC-IV") test and the Wechsler Individual Achievement Test, Second Edition ("WIAT-II"), and he believed that the test results were valid. (R. 220). K.D.W.'s full scale IQ on the WISC-IV was 56, which put his functioning in the Intellectually Deficient Range. *Id.* Mr. Pratt did not give a summary of the results of the WIAT-II, but the subtest scores he reported were in the 5th and 2nd percentiles. *Id.* Mr. Pratt stated that the test results showed that K.D.W. had severe delays in cognitive abilities and early reading, writing, and math skills, as well as significant delays in social, emotional, and communications skills. (R. 221). Mr. Pratt stated that K.D.W. qualified "for special education services as a student with a Developmental Delay (Suspected Intellectual Disability)." *Id.* An IEP was entered on September 2, 2008. (R. 227-34).

K.D.W. saw agency consultant Marcella H. Sweet, Ph.D. for a psychological examination on October 11, 2007. (R. 164-68). Wilson gave a description to Dr. Sweet of K.D.W.'s behavior, and she said that her concerns were speech, language, activity level, behavior, possible learning disabilities, and the way K.D.W. acted when he was upset. (R. 164-66). Dr. Sweet observed that K.D.W.'s speech was difficult to understand, he did not always correctly hear her instructions, and he was easily frustrated. (R. 166). Dr. Sweet administered the WISC-IV, and K.D.W.'s full scale IQ was 82, which was in the low average range of intelligence. (R. 167). Dr. Sweet's opinion was that K.D.W.'s scores did not fit the typical profile for a child with ADHD. (R. 167-68). In her summary, Dr. Sweet also noted that she did not see any "true signs or symptoms of" ADHD, but K.D.W. had been on medication on the day

5

of the testing. (R. 168). Dr. Sweet made several recommendations, including a referral for formal speech and language assessment, a referral for mental health counseling to help K.D.W. develop coping skills, and continued monitoring. *Id.* She believed that K.D.W. would need special services or tutoring to be successful in school. *Id.*

Agency nonexamining consultant Laura Lochner, Ph.D. completed a Childhood Disability Evaluation Form dated December 6, 2007. (R. 170-75). She found that K.D.W.'s impairments were severe but did not meet or equal the Listings. (R. 170). Dr. Lochner evaluated the six domains used in evaluating childhood disability. (R. 172-73). She found that K.D.W. had less than marked limitation in Acquiring and Using Information, and she noted his WISC-IV full scale score of 82. (R. 172). K.D.W. had less than marked limitation in Attending and Completing Tasks. *Id.* She noted his problems completing tasks and following directions, but she also referred to Dr. Sweet's statement that K.D.W. could "stop attention upon request." *Id.* Dr. Lochner found that K.D.W. had a marked limitation in Interacting and Relating with Others based on school records that showed that he bothered other children and sometimes hit them. *Id.* She found that he had no limitation in Moving About and Manipulating Objects, Caring for Himself, and in Health and Physical Well-Being. (R. 173). Nonexamining agency consultant Janice B. Smith, Ph.D. affirmed Dr. Lochner's evaluation on March 17, 2008. (R. 176-81).

## Procedural History

On August 21, 2007, Wilson protectively filed for Supplemental Security Income ("SSI") benefits under Title XVI, 42 U.S.C. § 1381 *et seq.*, on behalf of K.D.W. (R. 93-95). K.D.W.'s application for benefits was denied in its entirety initially and on reconsideration. (R. 43-50). A hearing before ALJ Richard J. Kallsnick was held May 21, 2009, in Tulsa, Oklahoma. (R. 23-40). By decision dated June 18, 2009, the ALJ found that K.D.W. was not disabled at any time through the date of the decision. (R. 13-22). On September 10, 2009, the Appeals Council denied review of the ALJ's findings. (R. 1-3). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 416.1481.

## Social Security Law and Standard of Review

A child under eighteen years of age is "disabled" for the purposes of determining benefits if he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). A three-step sequential process guides the Commissioner's determination of whether a child meets the disability criteria. 20 C.F.R. § 416.924(a). The ALJ must determine (1) whether the child is engaged in "substantial gainful activity"; (2) whether the child's impairment or combination of impairments is severe; and, (3) if severe, whether the child's impairment "meets, medically equals, or functionally equals the listings" set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Id.*

The third step requires an initial determination of whether the impairment meets the requirements of a listing by satisfying "all of the criteria of that listing, including any relevant

7

criteria in the introduction."[3] 20 C.F.R. § 416.925(c)(3). Next, if the child's impairment fails to meet the criteria, there must be a determination of whether it "medically equal[s] the criteria of a listing." 20 C.F.R. § 416.925(c)(5). An impairment is the medical equivalent of a listing "if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). Medical equivalence can be found where the child has an impairment included in the listings, but "do[es] not exhibit one or more of the findings specified" for the particular listing examined, or "one or more of the findings is not as severe as specified," yet there are "other findings related to [the] impairment that are at least of equal medical significance to the required criteria." 20 C.F.R. § 416.926(b)(1)(i)-(ii). Last, if the impairment neither meets nor medically equals any listing, there must be a determination of "whether it results in limitations that functionally equal the listings." 20 C.F.R. § 416.926a(a).

For an impairment to be the functional equivalent of a listing, it must be of listing-level severity because it results in either marked[4] limitations in two domains of functioning or an

---

[3]  An impairment cannot meet one of the listings merely on the basis of a diagnosis, there must be "a medically determinable impairment(s) that satisfies all of the criteria." 20 C.F.R. § 416.925(d).

[4]  There is a "marked" limitation in a domain where the impairment(s) interferes seriously with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "It is the equivalent of the functioning [the Commissioner] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.* The regulations further state:

> If you are a child of any age (birth to the attainment of age 18), we will find that you have a "marked" limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

20 C.F.R. § 416.926a(e)(2)(iii).

8

extreme[5] limitation in one domain. 20 C.F.R. § 416.926a(a). In assessing functional limitations, the ALJ considers all relevant factors outlined in 20 C.F.R. §§ 416.924a, 416.924b, and 416.929, including (1) how well the child initiates and sustains activities, whether he needs extra help, "and the effects of structured or supportive settings"; (2) how the child functions in school; and (3) how the child is affected by medications or treatments. 20 C.F.R. § 416.926a(a)(1)-(3). The ALJ examines whether the child functions "appropriately, effectively, and independently" in six domains, *i.e.*, "broad areas of functioning intended to capture all of what a child can or cannot do," compared with the abilities of other unimpaired children the same age. 20 C.F.R. § 416.926a(b)(1). The six domains are "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1)(i)-(vi).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the

---

[5] There is an "extreme" limitation in a domain where the "impairment(s) interferes *very* seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i)(emphasis added). "Extreme" refers to the worst limitations, but "does not necessarily mean a total lack or loss of ability to function." *Id*. "Extreme" represents the equivalent of functioning shown by a valid score at least "three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(3)(iii).

9

court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

At Step One, the ALJ found that K.D.W. had not engaged in substantial gainful activity. (R. 16). At Step Two, the ALJ found that K.D.W.'s ADHD was a severe impairment. *Id.* At Step Three, the ALJ found that K.D.W.'s ADHD did not meet listing 112.11 and that it did not medically equal the criteria of any listing. *Id.* The ALJ then evaluated the six domains set forth in 20 C.F.R. § 416.926a(b)(1)(i)-(vi) to analyze whether K.D.W.'s ADHD was functionally equivalent to a listing . He found that K.D.W. had less than marked limitation in the domain of Acquiring and Using Information. (R. 18). He noted that K.D.W. had problems with math and reading skills, but cited to Ms. Rockwell's statements that K.D.W. had improved and had "amazing potential." (R. 18-19). The ALJ found that K.D.W. had less than marked limitation in Attending and Completing Tasks. (R. 19). He noted K.D.W.'s history of not completing school work, but he stated that Dr. Sweet appeared to conclude that K.D.W.'s ADHD was controlled on medication. *Id.* He found that K.D.W. had a marked limitation in Interacting and Relating with Others, noting that K.D.W. had been involved in verbal and physical aggression and had been suspended at least twice. (R. 19-20). He found that K.D.W. had no limitation in Moving About and Manipulating Objects. (R. 20-21). He found that K.D.W. had less than a marked limitation in Caring for Himself, noting that Wilson testified that K.D.W. could do some self-care tasks with supervision. (R. 21). The ALJ also found that K.D.W. had less than a marked limitation in

10

Health and Physical Well-Being, noting that K.D.W. sometimes had balance issues and disregard for watching where he was going, but did not have significant impairments to his activities. (R. 21-22). Because he determined that K.D.W. had neither an "extreme" limitation in any domain of functioning nor a "marked" limitation in two domains, the ALJ found that K.D.W. was not disabled since the August 14, 2007 filing date.

## Review

K.D.W. asserts that the ALJ's Step Three evaluation and the credibility assessment were not sufficient. The undersigned agrees that the credibility assessment of the ALJ did not meet legal standards and therefore reverses and remands for further proceedings.

"Credibility determinations are peculiarly the province of the finder of fact." *Diaz v. Sec'y of Health and Human Servs.*, 898 F.2d 774, 778 (10th Cir.1990). However, the determination "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)(quotation omitted). Social Security Ruling 96-7p provides the following guidelines for credibility assessments:

> When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

SSR 96-7p, 1996 WL 374186 at *1. "This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision." *Id*. at *4. In the case of a child claimant, "the ALJ must make specific findings concerning the credibility of the parent's testimony, just as he would if the child

11

were testifying." *Briggs ex rel. Briggs*, 248 F.3d 1235, 1239 (10th Cir. 2001).

The ALJ did not make a credibility assessment, and his only statement regarding credibility was a boilerplate provision:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not credible to the extent they are inconsistent with finding that the claimant does not have an impairment or combination of impairments that functionally equals the listings for the reasons explained below.

(R. 18). This boilerplate provision does not meet the requirement that the ALJ give specific reasons linked to substantial evidence to support his credibility analysis. *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004) (boilerplate statements "[fail] to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that [the claimant's] complaints were not credible."); *Kepler*, 68 F.3d at 391. The ALJ's failure to perform an adequate credibility assessment fatally undermines the ALJ's decision, and this omission must be addressed on remand. *Briggs*, 248 F.3d at 1239.

Because the Court finds that reversal is required by the issue of credibility, the undersigned does not address the other issues raised by Wilson. The Court questions, however, whether the ALJ's discussion and consideration of the evidence of Mr. Pratt with TPS is adequate. For example, the ALJ discussed the WISC-IV test results found by Mr. Pratt with TPS, but he did not discuss the other test results, including the "severe" and "significant" developmental delays that Mr. Pratt found in testing K.D.W. (R. 221). The results of the developmental testing that Mr. Pratt conducted appear to show that while K.D.W. was seven years old at the time of the testing, he had the communication skills of a three-year-old. *Id.* The ALJ did not address this extreme developmental delay, and he did not assess whether this

12

affected his analysis of K.D.W.'s limitation in the domain of Acquiring and Using Information, which the ALJ found to be less than marked.

The Court would further note that the TPS testing occurred in July 2008, while Dr. Sweet's assessment and the nonexamining consultants' forms were completed in October 2007, December 2007, and March 2008. (R. 162-81, 220-21). Because the TPS testing happened after all of the agency consultants had given their opinion evidence, those experts did not have the opportunity to review the TPS evidence before giving their opinions, and the ALJ did not have the assistance of any of those consultants in understanding the significance of the TPS test results. On remand, the ALJ needs to ensure that he has fully discussed the TPS test results and their significance in evaluating whether K.D.W. is disabled at Step Three. Additionally, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Wilson.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 2nd day of March, 2011.

Paul J. Cleary
United States Magistrate Judge